# Supreme Court of Texas

No. 23-0111

In re Maria Teresa Ramirez Morris, and
Texas Alliance for Life, Inc.,

*Relators*

On Petition for Writ of Mandamus

JUSTICE YOUNG, joined by Justice Devine and Justice Blacklock, dissenting.

Today the Court refuses to remedy a clear violation of the Election Code. It offers a host of salutary reasons. I agree with them all—when they apply. But none of the Court's stated reasons apply here because they all depend on the same mistaken premise: the existence of a lawfully ordered special election. If such a special election had been properly called, each of these hoary principles would be relevant:

- "our longstanding commitment to avoid undue interference with elections," *ante* at 2;

- our preference to act "without disturbing [an] election from going forward," *id.* at 5;

- our historical practice of not "enjoin[ing] elections altogether," *id.* at 6; *see also id.* at 11;

- the obligation of the judiciary never to "deprive the voters of an election," *id.* at 6; and

- the need "to facilitate elections, not to stymie them," *id.* at 16.

Each of those important values, however, depends on a common premise that is missing here: a *lawfully ordered* election. The Court's reliance on those values requires it to assume the answer to the very issue that is in dispute—whether any special election for May has been validly ordered at all. Using doctrines that protect elections to protect events that are *not* elections is bootstrapping. When a purported election is not a real election, saying so does not "interfere" with an election; stating the correct date to hold an election does not "disturb" that election; telling the City when the law allows it to hold an election does not "enjoin" or "stymie" or "deprive" anyone of an election. These steps instead "facilitate" holding the election. Following the law of Texas can never be regarded as against the interests of the People of Texas.

Texas law provides strict requirements for calling special elections, including how to order them and when they may or must include petition-initiated proposed city-charter amendments. One such requirement is that, to hold a special election, a city council must order it *at least* 78 days beforehand. The city council clearly failed to follow that binding legal requirement here. The legislature expressly authorizes Texas courts to enforce such election requirements, which protect *all* voters. The courts should provide pre-election relief when, as here, the core of the protection will be lost forever if not vindicated before the election and when the request for relief is timely. The need for that relief is amplified in this case because other serious issues are also present,

such as when, whether, and how the courts can address the contention that the proposed charter amendment violates the Local Government Code's single-subject requirement. All the Court needs to address now, however, is the timing violation. It can and should do so by granting partial relief that directs the City to hold the special election in November, not May.

In my judgment, the Court's refusal to do so is mistaken and lacks substantial legal support. My disagreement does not connote disrespect. The Court's decision does not follow from any improper motive. To the contrary, it expresses a most praiseworthy motivation—the determination to allow the People to govern themselves through the electoral process. I share that commitment and disagree only as to how the judiciary properly serves that foundational principle. I cannot agree that the judiciary is limited to post-election relief in the narrow circumstances before us. I therefore must respectfully dissent.

## I

I begin with how this case came to us and why the law warrants granting partial relief.

## A

As the Court describes, a lengthy citizen-initiated petition in the City of San Antonio—dubbed the "Justice Policy Charter Amendment"— seeks to amend the city's charter through a variety of mechanisms concerning a host of policy issues, all related in some way to the enforcement of local, state, and federal law within the city.[1] This

---

[1] The Court briskly summarizes the proposed amendment, *see ante* at 2, which is even more dramatic than the brief summary suggests. Broadly speaking, the proposed amendment seeks to regulate or outright prohibit the

3

litigation commenced based on relators' contention that the proposed amendment's scope violated the single-subject requirement of Texas Local Government Code § 9.004(d).[2] Whether the proposed amendment is otherwise substantively or procedurally improper, however, is immaterial to the question before us now: whether there is any lawfully called special election at all.

The timeliness issue emerged after the city council scheduled a vote on February 16 for the purpose of ordering the May 6 election. That scheduling choice left only one extra day before the last possible day to comply with state law, which requires special elections to "be ordered

---

enforcement of abortion crimes, drug offenses, and theft (to name a few). More specifically, it would bar sharing specified information with other governmental agencies unless doing so would advance the proposed amendment's preferred policy goals (like "defend[ing] the patient's right to abortion care or the healthcare provider's right to provide that care"). It would regulate how the police enforce warrants; restrict police authority to seek so-called "no knock" warrants from a court; and limit what the police may take as evidence incident to a search. The proposed amendment would bar the use of "chokeholds" by the police and require that police release (rather than arrest) certain categories of alleged offenders—those charged with theft of property worth less than $750, those who bring contraband into a jail or prison, and those charged with various other crimes. The proposed amendment would also have its non-enforcement scheme overseen by a newly appointed "Justice Director," who would work with the city council and provide impact statements for any decisions affecting the city's budget or law enforcement. All that and far more.

[2] That contention, and its companion argument that such a multifaceted proposed amendment violates the requirements of Local Government Code § 9.004(e), warrant more analysis—including *whether* those provisions entail judicially enforceable rights and, if so, whether they protect voters at the polls (so that pre-election review is proper) or only those affected by enforcement of a voter-approved charter amendment (so that only post-election review is proper). *See infra* Part III (discussing how granting partial relief based on timing would have allowed the Court to consider these questions without the rush of emergency litigation).

not later than the 78th day before election day." Tex. Elec. Code § 3.005(c). Shortly before the vote, this Court ordered the parties to provide status reports regarding what action, if any, the city council took with respect to the proposed amendment, and what effect the city council's action had on the pending request for relief. The parties subsequently informed the Court that the ordinance ordering the special election passed by a vote of 7-0-3: seven voted to order the election; none voted against doing so; and three abstained from the vote.

All parties agree that, under the city charter, the ordinance could not take effect until February 26—ten days from February 16, when it passed—because it received fewer than eight votes. *See* San Antonio, Tex., City Charter art. II, § 15; *ante* at 3 & n.2.[3] Thus, the ordinance could only effectively "order" an election on February 26—*69* days before the scheduled election.

**B**

Yet the law requires 78 days, not 69. That 78-day requirement is clear and unambiguous. Tex. Elec. Code § 3.005(c).[4] Likewise clear and

---

[3] Delaying the effective date of a newly enacted law is common practice and courts must respect that aspect of legislation as much as any other. *Cf., e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 257 (1994) ("A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.").

[4] The legislature expressly eliminated any conceivable doubt that might be generated from other sources of law: "This section supersedes a law outside this code to the extent of any conflict." *Id.* § 3.005(b). The legislature's focus on timeliness is illustrated by its repeated amendments to *lengthen* the time required. *See, e.g.*, Act of Sept. 1, 2015, 84th Leg., R.S., ch. 84, § 3 (expanding the requirement from 70 days to 78 days); *In re Woodfill*, 470 S.W.3d 473, 480 n.11 (Tex. 2015) (noting this recent statutory elongation).

5

unambiguous is the city council's violation of it—a point the Court does not dispute. The only question, then, is what to do about it.

*Nothing* is one possible answer. It is the answer that the Court adopts by relying on the general principle of restraint in the context of elections as its justification. *See ante* at 5–6. I readily agree that election-related claims warrant a jaundiced judicial eye, especially when parties ask the courts to disrupt an ongoing election. *See, e.g.*, *In re Khanoyan*, 637 S.W.3d 762, 764–65 (Tex. 2022). But traditional judicial reluctance to disrupt an ongoing election is limited to just that: *an ongoing election*. There has been no lawfully ordered election in this case, so the principles of restraint that the Court ably summons today have no relevance here. Thus, far from merely applying our precedents and the separation-of-powers principles on which they are built, the Court unduly *expands* them to hold that we must idle by during an election that is no election at all.

Indeed, we have said that "[i]n some circumstances, litigants could present the courts with a clear violation of ministerial duties imposed by law, which—especially if brought early enough to avoid harm to the larger election—could lead to prompt judicial correction." *Id.* at 767. The present case surely qualifies. In the face of an objective basis to deem a special election invalid *ab initio* because of something as basic and clear-cut as the calendar,[5] the Court should say so without delay.

---

[5] I agree with the Court that the *general* election would proceed as planned regardless of what happens with respect to the special election. *See ante* at 12 n.30. A general election is an election, "other than a primary election, that regularly recurs at fixed dates," Tex. Elec. Code § 1.005(6), whereas a special election is simply one "that is not a general election," *id.* § 1.005(18). A general election will elect the mayor and council members, for example. Special elections include discretionary or irregular matters, like proposed charter

The violation is holding the election prematurely, *not* enforcing the election's results. The proper relief when a voter is asked to vote at the wrong time is to direct the city to hold the election at the right time, a *pre*-election remedy. By contrast, when a voter fears the outcome of an election, the voter must first await the election to see what the outcome even is before challenging it as legally infirm.[6]

Consider an analogous situation: violations of the double-jeopardy clause. The core right protected by that clause is immunity from standing trial a second time. That right will be destroyed if the courts force a defendant through a second trial on the theory that any conviction is speculative and can be reversed after the fact. That is why both federal and Texas courts allow extraordinary pre-trial relief through

amendments. The planned May 6 election is, as is common, a joint general and special election.

[6] The Court contends that post-election relief would allow relators to "fully present their claims in a trial court" and notes that "the law is typically better served when the lower courts review a legal issue before this Court does." *Ante* at 8 (quoting *Rattray v. City of Brownsville*, ___ S.W.3d. ___, ___, 2023 WL 243892, at *6 (Tex. Mar. 10, 2023)). I certainly vouch for the general proposition. But the Court places far too much weight on the word "typically." For one thing, in exceptional and time-sensitive circumstances like these (in which our rules expressly permit parties to seek relief directly from this Court, *see* Tex. R. App. P. 52.3(e)), the law certainly cannot be "better served" by condoning a violation of it. And for another, *post-election* relief is by definition inadequate for an injury that is complete at the time of the election. *Cf. In re Petricek*, 629 S.W.3d 913, 917 (Tex. 2021) (holding that a post-election remedy is inadequate "[i]f the ballot can be corrected before the election"). The Court fails to distinguish between (a) a challenge to the substance, in which—if a ballot item passes and would otherwise become enforceable—a party who objects to it can contend that the ballot item is nonetheless bereft of force and (b) a challenge to *how* the election is to be held, which has nothing to do with whether the ballot item passes or not and indeed could be brought by a voter regardless of that voter's support for or opposition to the underlying substantive proposition.

7

an appeal authorized by the collateral-order doctrine, *see, e.g.*, *United States v. Hollywood Motorcar Co.*, 458 U.S. 263, 266 (1982), or through a pre-trial writ of habeas corpus, *see, e.g.*, *Ex parte Robinson*, 641 S.W.2d 552, 555 (Tex. Crim. App. 1982). Likewise here: voters' core statutory right to be called only to properly authorized elections will be irretrievably harmed if we await the election before vindicating the right.

The Court seems to suggest that the 78-day requirement is no match for a petition-generated initiative. I cannot see why. The reason a proposed charter amendment is placed on the ballot is because state law requires it. The law channels ballot access in many ways. For example, for a proposed charter amendment to be placed on the ballot, the law has long required petition signatures only of the smaller of 5% or 20,000 of the qualified voters, even in our largest cities. *See* Tex. Loc. Gov't Code § 9.004(a). If the only basis for including a proposed amendment on the San Antonio ballot was that 19,000 signatures had been obtained, I find it hard to believe that the Court would not intervene to protect the voters from being convened to exercise their franchise without legal authority. I thus fail to see why 19,000 voters instead of 20,000 would be dramatically different than 69 days instead of 78. Both are necessary conditions for calling this special election.

Other existing requirements that channel authority to amend a charter include the frequency of doing so—a city may not amend its charter "oftener than every two years." Tex. Const. art. XI, § 5. This Court (by refusing a writ of error) has enforced that restriction on voting. *See State v. City Comm'n of San Angelo*, 101 S.W.2d 360 (Tex. Civ. App.—Austin 1937, writ ref'd). Despite the requisite number of

8

signatures for a proposed charter amendment, the Court agreed that it was not lawful to hold an election that would violate the frequency requirement. *Id.* at 360–61.

The 78-day mandate is a comparable requirement that we should enforce when it has clearly been violated. The Court implies that we should simply *ignore* the requirement because the city council was "arguably" bound to call the election. *Ante* at 8. I doubt that the casting of such votes was purely ministerial, and I think that the law confirms as much by providing for how to achieve ballot access if a city council, for reasons of principle or otherwise, proves unwilling to call an election or put a proposed amendment on the ballot. But regardless of any duty to have acted timely, the city council did not do so. In such instances, may courts retroactively *deem* the 78-day requirement to be satisfied even when it is not, thus judicially striking the 78-day requirement from the statute?

A better way to approach a situation like this one is to simply apply the provisions of the law, which are readily harmonized. Both state law and the San Antonio city charter provide for a two-step process in which the city council retains a proper but limited role. Under the law, the city council must have the first crack, but if it fails to act, the proposed charter amendment will be presented at the next available election—a specific right that the courts may enforce. *See* Tex. Loc. Gov't Code § 9.004(b); San Antonio, Tex., City Charter art. IV, § 41 (providing that if the city council "fails to pass an ordinance proposed by initiative petition . . . the proposed or referred ordinance shall be submitted to the electors on *the next* authorized uniform election date

9

that allows enough time to hold the election in the manner required by law" (emphasis added)).

In other words, we need not regard the city council as a potted plant or an automaton, as the Court does by recognizing *nothing* but a ministerial role for the council.[7] If there were such an utter lack of discretion, then mandamus relief certainly should have been forthcoming in *San Angelo*, where the city refused to place a proposed charter amendment on the ballot. 101 S.W.2d at 360–61. The legislature *could have* eliminated any role for city councils but instead has left it to city councils both to call special elections and to "prescribe the wording of a proposition that is to appear on the ballot." Tex. Elec. Code § 52.072(a). These are not examples of pointless political theater; they are part of the process. A city council's failure or refusal to act leads to a different remedy, which is also part of the process: granting the proposed amendment automatic access to the ballot in the "next" available election, enforceable if necessary by a court.

For this reason, we need only follow the law to preserve the rights of *all* parties (and, most importantly, the people of San Antonio) by recognizing that May 6 is no longer available for a special election. Contrary to the Court's assumption, May 6 is not "the earliest *lawful* opportunity" to hold a special election. *Ante* at 8 (emphasis added). That ship has sailed; it is no longer possible to comply with the 78-day

---

[7] Remarkably, despite one of the Court's bases for denying relief—that it may not intrude upon the prerogatives of the political branches—the Court castigates the three abstaining members of the city council as law-breakers because they did not *cast their votes* the way the Court concludes they were bound to do. *Ante* at 8–9 (suggesting that mandamus could lie for a court to order members to *vote* in a particular way).

10

requirement (or to order the city council to do so). Absent any other legally cognizable objection to the proposed charter amendment, however, the city council will no longer be in the position to foreclose the amendment from appearing on the November 2023 ballot.

The Court, however, denies all mandamus relief, casting the city council's ordinance ordering the special election as pure ceremony and conscripting San Antonio's voters into the same playbill—but at a cost. Allowing manifest violations of the law is bad enough. Inviting a costly and corrosive post-election challenge *no matter what* happens is unfortunate, too.[8] But perhaps most serious of all, if the charter amendment passes, San Antonians will be blocked from making any other amendments to their charter until *2025*. *See* Tex. Const. art. XI, § 5(a). As a result of the special election that should not have happened, other opportunities that *would* have been available for charter amendments will be gone forever. Ironically, the Court's resolution of this petition creates the very risk it purports to eliminate: the risk that the voters of San Antonio will be unable to vote on charter amendments they desire. I fear that today's decision will undermine the very right to vote the Court seeks to protect.

---

[8] Suppose that the proposed charter amendment fails. While those who oppose it, like relators, may be content to let bygones be bygones, what about someone who *supports* it? I take no position on whether such a person could bring a post-election challenge on the ground that the charter amendment should have been placed on the November ballot instead of the May ballot—but failing to address the timing problem *now* makes future litigation more likely even if the voters reject it.

## C

The Court's opinion portrays denial of relief here as tantamount to preserving the right to vote. If that truly were the question, I would gladly join the Court. The opposite is more nearly true, however, because the real question is whether there even is any valid election to which the voters can be summoned. Requiring voters to exercise their electoral authority when the law does not provide for it undermines our system of elections. Setting a special election is—or at least should be—a solemn act of self-government, not a casual event. If the Court is unwilling to protect electoral regularity even in the face of an open, obvious, and objective violation of legal standards, it will be hard for the Court to stop lawlessness of other sorts in future abuses of our system. Denying relief today does not protect that system but makes it more vulnerable. Forcing unlawful elections diminishes the respect we have for the rules governing them. Granting limited relief would have prevented these real and unfortunate consequences.

I now turn to the Court's rationale for why it refuses to act.

## II

As I see it, the Court invokes three main grounds to justify denying relators the pre-election relief they seek: two based on precedent and one based on statutory construction. None of the three, in my view, supports the Court's decision.

## A

First, the Court embraces as a chief authority our decision in *City of Austin v. Thompson*, 219 S.W.2d 57 (Tex. 1949). After citing the statutory provisions that empower courts to grant mandamus and

12

injunctive relief to prevent Election Code violations, the Court invokes *Thompson* to claim that, "[h]istorically . . . the Court has not enjoined elections altogether, even elections 'called without authority and therefore absolutely void.'" *Ante* at 6 (quoting *Thompson*, 219 S.W.2d at 59). "Historically" is the correct adverb, because *Thompson* relied *exclusively* on the traditional "power of a court of equity." 219 S.W.2d at 59. Neither the majority nor the dissent in that 5–4 decision mentioned any statutes at all. For good reason: not until two years *after* this Court declined to exercise its ordinary equitable authority in *Thompson* did the legislature confer the express statutory authority to grant either mandamus or injunctive relief to prevent Election Code violations.[9] *See* Act of May 30, 1951, 52d Leg., R.S., ch. 492, § 1, art. 7, 1951 Tex. Gen. Laws 1097, 1098.

The statutory authority is no makeweight. As the Court notes (*ante* at 10 n.30), we recently observed in *In re Stetson Renewables Holdings, LLC* that "an express statutory deadline . . . does not necessarily mean that the legislature intended for *courts* to enforce the deadline." 658 S.W.3d 292, 296 (Tex. 2022) (internal quotations omitted). But the Court does not complete the narrative, because we specifically

---

[9] One wonders if one (or all) of the five members of the *Thompson* majority, if armed with the statutory authority we now possess, would have joined the four dissenters to direct the City of Austin not to proceed with its "election." Regardless, that case was a strange one, turning purely on the Court's construction of Austin's city charter, which the Court unanimously read to forbid elections to fill unexpired city council positions. The election was not even *really* an election because the council used it as a way to invite the public to "advise" the council on whom the council should choose to fill the open spot. Whatever else *Thompson* means, it does not mean anything about Texas courts' authority *after* the legislature has acted.

juxtaposed the area of law at issue in *Stetson* with "election cases," where (again, "with extreme caution") courts indeed "may play a more active part" because "there is ample and express *statutory* authority for a judicial role." *Id.* (citing Tex. Elec. Code § 273.061).

## B

The Court's other lead authority is more recent and relevant: *Coalson v. City Council of Victoria*, 610 S.W.2d 744 (Tex. 1980). *See ante* at 9–10. The Court cites *Coalson* for two main propositions that only show how different this case is. Reaffirming *Coalson* does not remotely require denying relief today.

First, *Coalson* "held that any opinion on the constitutionality of the amendment before the election was held would be purely advisory because voters may disapprove the amendment." *Ante* at 10; *see id.* at 7 n.16. Quite right. The whole basis for the city council in Victoria refusing to put a proposed amendment on the ballot was the city council's view of whether the amendment, if passed, would have been legal. This is why the Court emphasized that the council members' declaratory-judgment action "seeks an advisory opinion" and why "[t]he election [would] determine whether there is a justiciable issue." *Coalson*, 610 S.W.2d at 747. By definition, such an unripe claim must await the election's outcome.

No such claim appears in this case, of course. True, relators (and apparently the city attorney and several members of the council) believe that, if passed, the proposed charter amendment would violate state law—but that is not the basis of their petition and not the basis on which I would grant relief. Instead, relators complain of a procedural injury

14

that materializes *whether or not* the proposed amendment passes: being forced to vote in an untimely ordered special election.

Second, the Court quotes *Coalson* for this accurate statement: "The City Council's duty [to order an election on a citizen-initiated amendment] is clear, and its compliance with the law is ministerial in nature." *Ante* at 8 n.23 (quoting 610 S.W.2d at 747). Again, quite right. In *Coalson*, a timely and properly ordered special election *was ongoing*. "The election process had been *lawfully* put in motion," the Court expressly observed. 610 S.W.2d at 747 (emphasis added). Unlike the special election here, the special election there contained other ballot items. *See id.* at 746. The only question was whether the city council could order a special election but *exclude* a validly proposed charter amendment that it disliked. Here, of course, that antecedent question, which was not at issue in *Coalson*, is precisely what the parties dispute: whether any "lawful" special election has been called, given the open violation of Election Code § 3.005(c).

The Court in *Coalson* was thus certainly correct to have held that the city council members violated their ministerial duties by attempting to block a proposition from the special election—after all, the election *had been ordered* without any challenge to any statutory (or other) prerequisite for doing so. *Id.* at 747. Likewise, it is obvious that the *properly ordered* special election was the "next" such election. The city council did not have a leg to stand on.

Worse yet, the very fact that (unlike here) the special-election order in *Coalson* was entirely valid explains why this Court was so focused on the detrimental consequence that would flow from excluding

15

the ballot initiative: the voters would have faced "a two-year delay before another charter election" could be held on it or any other proposed amendment. *Id.* at 746 (citing Tex. Const. art. XI, § 5). In a touch of irony, then, today's denial of relief yields the exact result *Coalson* sought to prevent: the threat to voters' ability to bring charter amendments within two years.

Coincidentally, the Court in *Coalson* cited *State v. City Commission of San Angelo*—the case I mentioned in Part I.B, *supra*—for this very point. *San Angelo* likewise involved a proposed charter amendment, but there "the city officials refused to call the election, on the sole ground that the charter of said city had [already] been amended by an election" less than two years ago, in violation of the frequency limitation on such amendments. 101 S.W.2d at 361. In the ensuing mandamus petition, supporters of the proposed amendment—observing the requisite number of signatures—sought to compel the calling of a special election despite the timing problem. Unlike the Court's ruling today, the holding in *San Angelo* was that officials *did not* have the authority, much less obligation, to call an unlawfully timed special election. If such a ministerial duty on the part of the council existed, then it would *not* have been "an example of typical judicial restraint," *ante* at 12 n.35, but an example of judicial unwillingness to protect the core rights of the People that the Court today so frequently invokes.

Said differently, the demanded election in *San Angelo*—just like today's—suffered from a threshold requirement that made it unlawful. In *San Angelo*, it was inconsistency with the Texas Constitution's two-year requirement; here, it is inconsistency with the Texas Election Code's

16

78-day requirement. *San Angelo* did not say "well, who knows, maybe it won't even pass—if it does, we'll take it up then." *Coalson* cited *San Angelo* approvingly: it was *because of San Angelo*'s correct holding (that another election with charter amendments would be improper *even with* sufficient signatures) that *Coalson* deemed it so important to allow the proposed Victoria amendment onto the ballot at once. *See Coalson*, 610 S.W.2d at 746.

But the sum and substance of today's decision is to invert *San Angelo* by holding, counterintuitively, that we must nevertheless *press ahead* in the face of such procedural infirmities. This approach is simply the election equivalent of the "certify now and worry later" approach we have forcefully rejected in the class-action context. *E.g.*, *Sw. Refin. Co. v. Bernal*, 22 S.W.3d 425, 435 (Tex. 2000).

## C

The Court's third key argument for denying relief is, in essence, a misunderstanding of the Election Code. That code simultaneously imposes deadlines for calling special elections and denies special elections the immunity from validity challenges granted to general elections. *See* Tex. Elec. Code § 3.007 ("Failure to order a *general* election does not affect the validity of the election." (emphasis added)).

Under our ordinary rules of interpretation, the very fact that the legislature went out of its way to say that an untimely order would *not* affect a general election's validity quite clearly implies that it *would* do so for a special election. Otherwise, we would have both *expressio unius*

17

and surplusage problems—canons of construction we have applied in case after case.[10]

But, in addition to its unduly narrow view of election deadlines generally,[11] the Court dismisses this consequence of § 3.007 (the "savings clause") by contending that "the savings clause [for general elections] predates statutory deadlines for special elections." *Ante* at 10 n.30. I fail to see how that matters. Looking to statutory history to see how a word was used is one thing; slicing up an integrated code to deny its provisions the usual semantic cohesion is quite another. We have always construed statutory text "as a whole," *In re Ford Motor Co.*, 442 S.W.3d 265, 280 (Tex. 2014) (quoting *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)), and presumed that the legislature acts "with complete knowledge of the existing law and with reference to it," *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). Those two principles have practical force here, where the legislature—when codifying the Election Code—added the deadline for ordering elections literally *just two sections* before it incorporated the preexisting savings clause for general elections—and maintained that it would be *only* for

---

[10] For surplusage, see, *e.g.*, *In re CenterPoint Energy Hous. Elec., LLC*, 629 S.W.3d 149, 159 (Tex. 2021); *Waak v. Rodriguez*, 603 S.W.3d 103, 108 (Tex. 2020); *Randol Mill Pharmacy v. Miller*, 465 S.W.3d 612, 617 (Tex. 2015). For *expressio unius,* see, *e.g., ConocoPhillips Co. v. Koopman*, 547 S.W.3d 858, 877 (Tex. 2018); *Johnson v. Second Inj. Fund*, 688 S.W.2d 107, 109 (Tex. 1985); *James v. Brown*, 637 S.W.2d 914, 918 (Tex. 1982); *State v. Mauritz-Wells Co.*, 175 S.W.2d 238, 241 (Tex. 1943); *Collingsworth County v. Allred*, 40 S.W.2d 13, 15 (Tex. 1931).

[11] As noted above, the Court cites *Stetson* (rather expansively) for the proposition that courts need not enforce the Election Code's statutory deadlines. *See ante* at 10 n.30; *supra* Part II.A (explaining why *Stetson* said the opposite of this in the election context).

general elections. *See* Act of May 13, 1985, 69th Leg., R.S., ch. 211, § 1, 1985 Tex. Gen. Laws 802, 809 (adding newly codified §§ 3.005–.007).

In short, the Court's chief authorities do not support the denial of partial relief. I fear instead that the deployment of these authorities will harm the coherence of our election law and indeed of our general approach to statutory construction.

### III

The issue that originally divided—and still divides—the parties is not the election's timeliness. Rather, it is whether, when, and how the courts can vindicate the requirement that a charter amendment "may not contain more than one subject," along with the corresponding mandate that "[t]he ballot shall be prepared so that a voter may approve or disapprove any one or more amendments without having to approve or disapprove all of the amendments." Tex. Loc. Gov't Code § 9.004(d), (e). The parties vehemently disagree about whether the lengthy proposed charter amendment violates these statutory requirements.[12]

We ought to prefer not to resolve on an emergency basis such a fraught question. Nor would it be necessary: granting partial relief on the ground of untimeliness would carry the added benefit of allowing the Court adequate time to consider the single-subject question. After

---

[12] The City repeatedly asserts in its filings that mandamus relief is unnecessary and improper because of an available post-election remedy should the amendment pass. Given the Court's resolution, the City certainly could not challenge the procedural availability of a post-election remedy with respect to the single-subject requirement. *See Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 643 (Tex. 2009) ("Judicial estoppel precludes a party who successfully maintains a position in one proceeding from afterwards adopting a clearly inconsistent position in another proceeding to obtain an unfair advantage.").

19

directing the election to be held in November, *as the law requires*, I would direct merits briefing so that our ultimate resolution of the single-subject question could deliver on two promises that our law makes to voters: that they can vote on what they wish *and* that they will not be asked to do so in the face of noncompliance with important legal requirements.

Taking that opportunity now would be sensible. For one thing, the single-subject question is unlikely to disappear no matter what happens in the May election *because* the timing issue will likely keep it alive.[13] For another, the question of whether a single-subject claim is properly brought *before* an election will be hard to answer *after* an election, and granting partial relief now would give us an unusual opportunity to do so with comparative leisure. There are at least three important questions we will have to address at some point.

*First*, is the Local Government Code's single-subject requirement judicially cognizable? Even if courts properly can reach it, we must be persuaded, among other things, that we have access to judicially administrable standards. Otherwise, the dispute might constitute a nonjusticiable political question. *See, e.g.*, *Van Dorn Preston v. M1 Support Servs., L.P.*, 642 S.W.3d 452, 465 (Tex. 2022) (concluding that the presence of judicially manageable standards meant that courts could adjudicate the case at issue); *see also* Jeffrey S. Sutton, *Who Decides? States as Laboratories of Constitutional Experimentation* 258–60 (2022)

---

[13] I agree that, *if* the special election had been timely called, and if the proposed amendment were to be defeated at the polls, then the single-subject question would become moot. With the untimely special election, though, any hope of mootness will likely be, at best, long deferred by litigation.

("The nature of the single-subject [requirement] does not demand judicial enforcement," *id.* at 258, because it "faces a soaring level of generality problem," *id.* at 260.). The parties' comparatively cursory briefing on this point reflects a divergence about what the single-subject requirement means.[14]

---

[14] Notably, the Texas *Constitution* includes a single-subject provision similar to that of Local Government Code § 9.004(d). *Compare* Tex. Const. art. III, § 35(a) ("No bill . . . shall contain more than one subject."), *with* Tex. Loc. Gov't Code § 9.004(d) ("An amendment may not contain more than one subject."). Chief Judge Sutton's observation quoted above was primarily directed to such *constitutional* requirements, which are common among American states. Whether our *Constitution* allows courts to enforce the single-subject requirement against the *legislature*, a coordinate branch of state government, asks a very different question than whether a *statute* requires the courts to enforce its provisions against *cities*, which are administrative units of the State.

In addition to this structural difference, there is a textual distinction: the Constitution says that a "bill" (not a statute) may not contain more than one subject. That distinction at least suggests that the constitutional single-subject requirement is "directed at the legislature's own process for enacting laws," Sutton, *supra*, at 258, so the legislature itself (especially, perhaps, the other house) and not the judiciary must enforce it. By contrast, the Local Government Code focuses both on the end product, as § 9.004(d) makes clear, *and* on the process leading to it, as § 9.004(e) shows. The latter provision states that "[t]he ballot shall be prepared so that a voter may approve or disapprove any one or more amendments without having to approve or disapprove all of the amendments." No comparable constitutional provision exists to limit the legislature.

So perhaps the legislature borrowed the Constitution's language but imposed a *different* single-subject standard, at least with respect to justiciability, on municipalities. Similar language can convey different meanings in the constitutional context. The U.S. Supreme Court has long given markedly different meanings to the nearly identical text of Article III and (what is now) 28 U.S.C. § 1331, both of which describe "arising under" jurisdiction. *Compare Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 823–25 (1824) (construing the constitutional grant expansively enough to reach any case with a mere federal "ingredient," including a *potential* ingredient), *with Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908) (construing the same

*Second*, if the question is justiciable, what are its doctrinal boundaries, and what is the proper level of deference that will allow courts to distinguish between (a) a single issue with related subparts and (b) multiple separate issues? Perhaps § 9.004(e) will assist. If the legislature aims to protect voters from having to make impossible or unfair choices, as § 9.004(e) provides, then § 9.004(d)'s single-subject requirement might still require substantial deference to city councils (or citizens promoting initiatives). Perhaps further analysis would confirm (or refute) the instinct thus far reflected in some lower-court opinions.[15]

*Third*, if the courts can address the question, may they do so before or only after an election? There is at least a plausible argument that single-subject scrutiny, if permissible at all, should be done as soon as possible. The requirements of § 9.004(d)–(e) appear designed to protect the very act of voting. If the goal is to ensure that voters spend their time and civic energy only on properly framed ballot items, it seems

---

language as a *statutory* matter to authorize jurisdiction only when a federal question is on the face of a well-pleaded complaint).

[15] *See, e.g.*, *City of Galena Park v. Ponder*, 503 S.W.3d 625 (Tex. App.—Houston [14th Dist.] 2016, no pet.). I express no view regarding whether any part of that opinion was correct but note that the case suggested that a "single subject" could encompass integrated policy changes that would not be feasible to pursue *except* as a unit. At issue there were proposed "rules governing the appointment and qualifications for police chief and fire chief [that] are part of the subject of how the city's emergency services departments are to be organized." *Id.* at 635. When reticulated provisions depend on one another, such that courts must defer to municipalities, the question may be whether the proposed amendment's provisions here are in any real sense mutually dependent or are only vaguely related. If the latter, providing guidance to reliably inform local governments about how attenuated a relationship can be before § 9.004(d) is implicated may be challenging. Further briefing would clearly assist in devising a proper starting point.

suitable—when possible, *see Khanoyan*, 637 S.W.3d at 764–66—to provide pre-election relief.[16] Indeed, if § 9.004(d)'s single-subject requirement aims to facilitate the voter's right in § 9.004(e), then the single-subject requirement would logically be one that, when timely presented, should be vindicated before votes are cast.

I take no position on any of those questions yet, much less determine how the answers to those questions would apply here. But it should be self-evident that answering them will be a very serious endeavor. These thoughts, I hope, explain why I believe that we should have accepted the opportunity that partial relief would have afforded us to consider each question without undue haste.

## IV

I could better understand the Court's denial today if it was predicated on the concern that granting *this* mandamus petition would break the dam and create an influx of similar pre-election challenges across the second largest State in the Union. This Court cannot sit as a court of first instance whenever someone is aggrieved. There are only nine of us in a State with 254 counties and 30 million residents. We sit *en banc* in every case. But given the unusual posture of this dispute— saddled with not only a single-subject issue but also with a violation of the 78-day election-order requirement—we should not be worried about the limited ramifications that might follow from a partial grant of relief. If the city council has indeed violated the 78-day election-order

---

[16] By contrast, a challenge to the legal substance of a properly framed ballot item could *not* be challenged *ex ante*; no one asks the Court to reject the proposed amendment here on the ground that its provisions might be unlawful, even though some parties clearly believe that to be true.

requirement, which it clearly has, I suspect our saying so would lead more municipalities to dutifully observe their deadlines. Even the occasional blown deadline in the future would lead to relief in the lower courts in light of an unequivocal and easily followed precedent from this Court. Granting partial relief today would open no floodgates.

* * *

The right to vote is unquestionably fundamental. It is how we remain a self-governing people. *See Khanoyan*, 637 S.W.3d at 763. But the People of Texas also have chosen to guard their electoral role by enacting comprehensive legislation that ensures the propriety of elections that are called. The People also have given their courts broad authority to enforce compliance with "any duty imposed by law in connection with the holding of an election" through the issuance of writs of mandamus. Tex. Elec. Code § 273.061(a). We should use that authority sparingly— but we should use it when it is warranted, as it is here.

Respondents are wrong to suggest that following the law would "thwart the will of thousands of San Antonio voters." Following the law would *implement* the will of *all* the voters of San Antonio—and of Texas. Likewise, I disagree with the Court that following the law would "disrupt[] the settled expectations of the people of San Antonio." *Ante* at 2. The People's settled expectations are that the law will be followed—that they will be called to the polls when the law so requires but not otherwise.

The Court summarizes its holding with a troubling statement: that "[c]ourts must not lightly usurp [the] power" of placing popular initiatives on local ballots. *Ante* at 16. I propose a different rule: courts

24

should *never* usurp *any* power in *any* context—not lightly, not hesitantly, but never. When power *does* belong to the courts, as the authority to enforce election law unquestionably does, we should *cautiously* exercise that power. Cautiously discharging the judicial role here requires granting modest partial relief: holding that there is no lawful authority for a special election in May.

I respectfully dissent.

_____
Evan A. Young
Justice

**OPINION FILED:** March 17, 2023